United States District Court
Eastern District of Michigan
Southern Division

United States of America,

                                                       Case No. 2:25-cr-20612-2

v.

                                                       Hon. Mark A. Goldsmith

D-2 Karar Alnakash,

      Defendant.

_____/

**Government's Response to Alnakash's
Motion to Revoke Detention Order**

    Karar Alnakash is a 41-year-old native of Iraq who was heavily involved in smuggling stolen vehicles to his country of birth, where he maintains citizenship, and which does not extradite its own nationals. He has ample assets and family ties in the Middle East and frequently travels there for weeks at a time. He was not honest with the Court's pretrial services officer about his assets, including those in this country and overseas. In short, Alnakash, who faces years in prison under the federal sentencing guidelines, is a serious flight risk. The magistrate judge correctly determined that pretrial release was inappropriate.

    **I.**    **Facts**

*A. Overview of conspiracy, indictment, and procedural history*

For over two years, federal law enforcement investigated a scheme to smuggle stolen automobiles and auto parts to the Middle East in shipping containers from July 2023 through August 2025. The indictment outlines two groups of conspirators: broker-middlemen who worked with car thieves to supply smugglers with stolen cars, and the smugglers who negotiated (illegal) sales with the broker-middlemen for the stolen cars, took possession of the cars, paid the brokers and thieves, packed the vehicles and parts into shipping containers, and shipped these items to the Middle East, including Iraq, the United Arab Emirates, and Turkey. The smugglers conducted their operations at four commercial/industrial lots in Detroit. Alnakash was one of the smugglers.

Part of the conspiracy involved the smugglers making false statements to freight-forwarding agents, which are akin to travel agents for shipping containers. As a result of the shippers' representations, freight forwarders file manifests with U.S. Customs and Border Protection, listing the contents of the shipments. The filing of complete and accurate shipping manifests with CBP allows the

2

government to verify that the to-be-exported items are lawfully exportable under U.S. law. Smugglers in this conspiracy routinely misrepresented the contents of their shipments when communicating with freight forwarders to conceal the illicit nature of the shipments from customs authorities.

Law enforcement searched over 200 containers in the United States and elsewhere, interdicting and recovering over 400 intact stolen vehicles and many more stolen parts. The estimated value of just the recovered intact vehicles was $39 million.

B.   *Alnakash's shipments/complicity in the conspiracy*

Alnakash was actively involved in smuggling stolen cars. Some examples:

Alnakash shipped container MIEU0000977 via KJ Auto Sales, his company, in October 2023, destined for Iraq. Alnakash falsely told the freight forwarder that MIEU0000977 contained antifreeze:

3



Inside the container, which law enforcement later interdicted in New Jersey, were two stolen Ford F-150 Raptors, both luxury models, destined for Iraq.

In the spring of 2025, Alnakash used another company of his, KJ Trading, LLC, to ship MRKU 3492058, which was destined for Iraq. Law enforcement interdicted the shipment in Detroit and found it contained numerous stolen auto parts.

Alnakash used another firm, Armada Towing, as cover for his illicit activities. Armada was the shipper of 20 containers of stolen cars and/or parts in this investigation.

In the spring of 2025, law enforcement obtained Title III authorization to intercept coconspirator Haydar Al Haydari's communications. In an intercepted call from April 19, 2025, Alnakash relayed to Al Haydari conversations he had had with Armada's trade attorney regarding penalties Armada was incurring for interdicted shipments. Alnakash stressed that he told the attorney that the registered agent had nothing to do with the business, and that she was to be kept out of it. He then told Al Haydari, "I'm just trying to keep you updated." "Good job," Al Haydari replied.

Alnakash had numerous other conversations with Al Haydari regarding this scheme. Indeed, the two had 7,415 communication events (calls or individual text messages) between July 2023 and May 2025. In a March 20, 2025, call, Alnakash mentioned problems obtain obtaining containers headed to Iraq from Maersk, a vessel line. CBP was returning some of the shipping containers. "We don't have a second route like in Turkey [or] Iran," Alnakash said, and added that they should "do a new company not under our names."

On May 12, 2025, Alnakash told Al Haydari, "If I go to prison, I will call you to bring me noodles." Two days later, Alnakash told Al

5

Haydari that KJ Promax, an assumed name of his firm KJ Trading, was "burned." He explained: "If anything goes with it, they will return back." Law enforcement overheard multiple instances of co-conspirators reporting to Al Haydari that an entity was "burned," or needing the name of a non-burned company, or words to that effect. Notably, by the time of each of these utterances, CBP had flagged the company in its system such that any future shipments were likely to be subject of inspection. Those entities, in fact, had been burned.

Alnakash did not report KJ Promax, KJ Trading, KJ Auto Sales, or Armada Towing, as employers during his pretrial interview. *See* bail report dated Sept. 8, 2025, pp. 2–4. He did report Auto Drive Automotive as his employer. That entity formed in 2021 and its registered agent is Alnakash's wife. The wife's English-language skills are limited, Alnakash told the Court's pretrial officer. *Id.* at 2.

During an interview with law enforcement on Sept. 4, 2025, Alnakash's wife told agents (via a certified Arabic translator) that she was not involved in Alnakash's business. She said she periodically signed documents for the business when asked, and also signed checks for her son.

6

*C. Alnakash indicted and detained*

A federal grand jury indicted Alnakash for conspiracy to transport a stolen vehicle or vehicles and two counts of transportation of a stolen vehicle. ECF No. 1.

U.S. Magistrate Judge Anthony P. Patti granted the government's request to detain Alnakash pretrial, following a hearing held on Sept. 9, 2025. Judge Patti relied on Alnakash's access to considerable resources, including in other countries; failure to be forthcoming with pretrial services about those resources and his business activity; extensive and recent international travel, including in connection with the charged conspiracy; and ties to Iraq, which does not extradite its citizens. ECF No. 82, PageID.154.

*D. Alnakash's, international ties, and property overseas*

As an Iraqi citizen, Alnakash can obtain a passport from his native country. Law enforcement found Iraqi identification cards and passports for Alnakash and members of his immediate family while executing search warrants at his house in September 2025.

7

In the below image of an Iraqi citizenship card the government found at Alnakash's residence, the red writing underneath the bird indicates the card was a replacement.



Alnakash told the Court's pretrial officer he has aunts and uncles in Najaf, Iraq. Bail report, p. 2. Notably, Iraq has extradited only two individuals to the United States since the 1980s, neither of whom was an Iraqi citizen. Indeed, Iraq does not extradite its own citizens.

Alnakash's wife told law enforcement that she and her family had traveled to the Middle East in July and August with her husband and two of her children. They stayed in a hotel in Turkey and with family in Iraq.

In an intercepted telephone call on April 25, 2025, Alnakash revealed he and Al Haydari had $500,000 in Dubai. On March 28,

Alnakash suggested Al Haydari visit Salapya, Turkey: "Go, there is an area named Salapya, where my apartment is."

Alnakash also has extensive international travel to at least two of the three countries (Iraq and Turkey) to which conspirators have shipped stolen cars and parts. That travel includes:

- August 2025: 17 days, arriving in and returning from Baghdad, Iraq,
- June-July 2025: Five weeks, arriving in Baghdad, and returning via Istanbul, Turkey,
- October 2024: Six days, arriving in and returning from Baghdad,
- January-February 2023: 11 days, arriving in and returning from Erbil, Iraq,
- June-July 2022: one month, arriving in and returning from Istanbul,
- May 2022: two days in Canada,
- January 2022: 11 days, arriving in and returning from Najaf, Iraq,

9

- September 2021: 18 days, arriving in and returning from Najaf, and

- July-August 2021: one month, arriving in and returning from Najaf.

*E. Alnakash's property in the United States*

Alnakash told the pretrial officer preparing the bail report that his residence and business were collectively worth $304,000. Bail report, p. 2. But the government's investigation revealed other properties and other assets.

First, the government located $33,000 in pants in Alnakash's residence. After executing search warrants contemporaneous with the arrest of the eight charged defendants, the government learned of a safe-deposit box in Alnakash's name, which he also did not disclose to pretrial services. Upon searching the safe-deposit box, the government discovered several pounds of gold jewelry. Below are some images of those items in the safe-deposit box:






During a search of Alnakash's residence, law enforcement found various jewelry receipts from April and May 2024 totaling $6,900 and a $6,810 receipt for jewelry for Alnakash's wife from September 2024.

One of the real-estate properties is on Harmony Lane in Van Buren Township and has an estimated value of $795,000. During an intercepted call from March 19, 2025, Alnakash told Al Haydari that he found "our loan papers," then specified that he was referring to

11

"Harmony's." Law enforcement found loan-payoff documents for the residence in Al Haydari's e-mail. Later that same day, a third party told Al Haydari that Karar owed $95,000 on the house.

Alnakash's Dearborn Heights residence has an estimated value of $745,000. Alnakash told the Court's pretrial officer its value was $250,000. The property is in the name of a third party (the same third party as above). When law enforcement searched Alnakash's residence in early September, it found a handwritten land-sale contract in Arabic between Alnakash and the third party, dated June 3, 2023. Under the agreement, Alnakash made a down payment of $300,000 on a total price of $830,000 and was to pay off the balance in six months to one year. Al Haydari witnessed the agreement.

A third property is a commercial property on Plymouth Road in Detroit with an estimated value of $325,000. Law enforcement has reviewed records of multiple payments referencing this Plymouth Road property from KJ Auto Sales, Auto Drive Automotive (Alnakash's listed employer), KJ Auto Sales, and Alnakash personally.

The last pertinent property is ostensibly owned by Alnakash's 18-year-old son. It is a residence on Hopkins Street in Inkster with an

12

estimated value of over $79,000. Alnakash's son obtained a loan for $35,512.93 in April 2025. Under the agreement, Alnakash's son was to pay off the balance to the lender in one year, at zero interest. The seller was D3M Investment, LLC, whose registered agent is Al Haydari's wife.

Alnakash's 2022 tax filing reported $57,884 in adjusted gross income.

*F. KJ Auto Sales's violations with the State of Michigan*

KJ Auto Sales, the former name of Alnakash's dealership, had numerous administrative violations with the State of Michigan. What follows is just a sampling of those violations: On Aug. 18, 2023, the state cited KJ Auto Sales for forging a customer's signature on an application for vehicle title. On Oct. 9, 2023, there was another citation for failing to have records available for inspection. The foregoing violations occurred while Alnakash's firm was on probation with the Michigan Department of State for previous violations. Under that March 2023 probationary agreement, Alnakash promised to attend mandatory training within 180 days. By October of that year, he had failed to attend the training.

**II. Standard**

"A judicial officer shall order the [pretrial] detention" of a defendant if the officer "finds that no condition or combination of conditions will reasonably assure the appearance of the person[.]" 18 U.S.C. § 3142(e)(1). The government must establish risk of flight by a preponderance of the evidence. *United States v. Hinton*, 113 F. App'x 76, 77 (6th Cir. 2004) (citing *United States v. Cisneros*, 328 F.3d 610, 616 (10th Cir. 2003)).

## III. Argument

All the pertinent 3142(g) factors weigh in favor of detention. Alnakash has undisclosed assets and family overseas, and undisclosed assets in the United States. He can travel to and stay in the Middle East indefinitely. His country of origin (and citizenship) will not extradite him here. Accordingly, Magistrate Judge Patti correctly concluded that detention was appropriate.

### A. *The nature and circumstances of the offenses weigh in favor of detention.*

Both the nature and the circumstances of Alnakash's offense weigh in favor of detention. First, the nature: Congress treats both the conspiracy and substantive offenses very seriously, as they are five- and 10-year offenses, respectively. 18 U.S.C. §§ 371, 2312.

14

The conspiracy involves the recovery of over 400 intact stolen vehicles valued at approximately $39 million and many stolen/chopped parts. Suffice it to say, law enforcement did not interdict all the conspirators' stolen cars and parts. The government's preliminary estimate of Alnakash's sentencing guidelines is 121 to 151 months in prison, which assume a three-point reduction for acceptance of responsibility.

The conspiracy involved the shipment of stolen cars internationally. Furthermore, it involved the fencing of those stolen cars by international partners. And, notably, the intercepted communications revealed likely proceeds of the conspiracy in the Middle East.

Lastly, the conspiracy involved dishonesty. For example, the conspirators (including Alnakash) made false statements to freight forwarders who relied on those statements in filing (false) manifests with U.S. customs authorities. The conspirators created new shipping companies on paper to throw off CBP. And, on at least one occasion, Alnakash and Haydari used one person as a named owner of an entity

15

when, in fact, Alnakash and Haydari wanted the owner to have nothing to do with the business. This factor weighs heavily in favor of detention.

> B. *Alnakash's history and characteristics weigh in favor of detention.*

Alnakash's international ties are significant. He has family in Iraq and citizenship there. Iraq does not extradite its own nationals, meaning flight to that country is a very serious concern.

Alnakash's offer to "gladly waive his extradition rights" is meaningless, as doing so would only negate the need for an identity hearing with a state that extradites its own citizens. Alnakash has not identified one circumstance in which Iraq has extradited one of its own, and his offer to waive would not affect Iraq's extradition policies.

The track record of Alnakash's KJ Auto Sales company is also revealing as to Alnakash's reliability as a pretrial bonder. The company was on administrative probation to the Michigan Department of State, by consent, when it committed violations, including forgery of a title. Alnakash failed to comply with the promise to attend training under that agreement, and, notably, the charged crimes occurred while his firm was under that probation agreement.

16

Compounding matters, Alnakash was not honest with the Court's pretrial services officer. *See, e.g., United States v. Jackson*, No. 2:21-cr-20610-3, ECF No. 121, PageID.524 (E.D. Mich. Dec. 16, 2021) (Goldsmith, J.) ("If the Court were to release Jackson on bond, the Court would need to have confidence that Jackson's representations to Pretrial Services have been true and that Jackson could be found at the location he provided.") He did not disclose the $500,000 in Dubai or the apartment in Turkey. He did not disclose the $795,000 Harmony Lane property in Van Buren, the $325,000 Plymouth Road property in Detroit, or the Hopkins property in Inkster. And he grossly underreported the value of his $745,000 residence in Dearborn Heights.

Lastly, given the extensive amount of assets Alnakash controls, it appears highly unlikely that his 2022 tax filing (claiming only $57,884 in adjusted gross income) was accurate. These factors weigh in favor of detention.

C. *The weight of the evidence of Alnakash's risk of flight weighs in favor of detention.*

Alnakash has the motive and means to flee the country and lacks only the opportunity, which pretrial release would supply. First, motive: Alnakash's guidelines call for a sentence of many years in

17

prison. His history shows that accountability and honest dealing are not priorities. Alnakash faces years in prison if he stays here.

Alnakash knew the wrongfulness of his conduct and was worried about potential consequences, evident when he requested Al Haydari bring him noodles in prison. There is no indication that he knew of criminal charges until his arrest—the indictment remained under seal until the defendants' arrest. Alnakash's decision not to flee before his arrest, contrary to his argument, is of no significance. Now that he is aware, he has a significant motive to flee.

Next, means: Alnakash has substantial cash and real estate overseas, and likely has favors he can call in from foreign partners. It is reasonable to infer that he retains sizable assets overseas. He made a $300,000 down payment with a promise to pay off the balance within a year. His travel history—notably, to two of the three countries that have received stolen cars from this conspiracy—shows that he can stay overseas for long periods of time.

Finally, opportunity: Alnakash's surrendering his U.S. passport is cold comfort because he can travel as an Iraqi citizen. Indeed, the seized evidence shows Alnakash even can obtain a replacement Iraqi

18

citizenship card. And, given Iraqi extradition practices, he would not return. Alnakash's history of dishonesty and broken promises show that his word, contrary to the saying, is not his bond.

## IV. Conclusion

The government need not show a certainty that Alnakash will flee, only that, by a preponderance of the evidence, "no condition or combination of conditions will reasonably assure the appearance of the person as required." 18 U.S.C. § 3142(e)(1); *Hinton*, 113 F. App'x at 77. The magistrate judge correctly determined that there was no such reasonable assurance. This Court should deny his motion.

    Respectfully Submitted,

    JEROME F. GORGON JR.
    UNITED STATES ATTORNEY

    /s/ Louis F. Meizlish
    Assistant United States Attorney
    211 W. Fort St., Suite 2001
    Detroit, Michigan 48226-3211
    313-226-9745 | louis.meizlish@usdoj.gov

Dated:    Nov. 10, 2025

## Certificate of Service

I hereby certify that I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification to the attorney(s) of record.

/s/ Louis F. Meizlish
Assistant United States Attorney
211 W. Fort St., Suite 2001
Detroit, Michigan 48226-3211
313-226-9745
louis.meizlish@usdoj.gov